# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CIVIL ACTION NO. 3:CR-10-161 |
| JHONNY FELICIANO, | (JUDGE CAPUTO) |
| Defendant. | |

## **MEMORANDUM**

Presently before the Court is Jhonny Feliciano's ("Feliciano") Motion Pursuant to 28 U.S.C. § 2255. (Doc. 43.) For the reasons that follow, Feliciano's motion will be denied.

## I. Background

### A.  Relevant Factual Background

On May 25, 2010, a one count Indictment was returned against Feliciano in the United States District Court for the Middle District of Pennsylvania. The Indictment charges that on or about April 20, 2010, Feliciano possessed with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1).

Feliciano appeared in court for arraignment on the charge on June 21, 2010. At the arraignment, Feliciano had the assistance of an interpreter. (Doc. 48, 2:1-4.) During the arraignment, the prosecutor, John Gurganus, Jr. ("Gurganus"), placed on the record the maximum sentence as follows:

> Judge, the defendant has been charged in a one-count indictment with possession with the intent to distribute cocaine, and the maximum possible sentence for that offense is 20 years' imprisonment, a $1 million fine, up to a life term of supervised release and a $100 special assessment. There is a mandatory minimum three-year term of supervised release that must follow any term of imprisonment, but there's no mandatory minimum prison sentence for this offense.
>
> Those are the possible penalties. Also the defendant is, I note, a legal resident from what I understand, but he would be subject to deportation in the event of a conviction.

(*Id*. at 3:1-11.) Feliciano was then asked whether he understood the maximum penalty that could be imposed if he was found guilty of the offense. He responded in the affirmative. (*Id*.

at 3:12-19.) Feliciano then pled not guilty.

Thereafter, the parties entered into a Plea Agreement. The Plea Agreement and Defendant's Acknowledgment of Rights Waived by Guilty Plea were filed on November 30, 2010. (Docs. 19; 20.) Among other provisions, the Plea Agreement provides:

> Appeal Waiver. The defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the conviction and sentence imposed. Acknowledging all of this, the defendant knowingly waives the right to appeal any conviction and sentence, including a sentence imposed within the statutory maximum, on any and all grounds set forth in Title 18, United States Code, Section 3742 or any other grounds, constitutional or non-constitutional, including the manner in which that sentence was determined in light of United States v. Booker, 125 S. Ct. 738 (2005). The defendant also waives the defendant's right to challenge any conviction or sentence in the manner in which the sentence was determined in any collateral proceeding, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The defendant further acknowledges that this appeal waiver is binding only upon the defendant, and that the United States retains its right to appeal in this case.

(*Plea Agreement*, ¶ 31.) The Plea Agreement also states: "Deportation. The defendant understands that, if he/she is not a United States citizen, deportation is a possible consequence of his plea." (*Id*. at ¶ 27.) The Acknowledgment of Rights similarly provides "as part of the plea agreement, I am waiving my right to appeal and/or challenge my conviction and sentence, and the manner in which it was imposed," and that "I understand that if I am not a citizen that deportation may be a possible consequence of a conviction." (*Acknowledgment of Rights*, ¶ 2.)

On May 26, 2011, Feliciano appeared in court and pled guilty to the Indictment. (Doc. 49.) At the guilty plea hearing, Feliciano had the services of an interpreter. (*Id*. at 2:7-10.) While under oath, Feliciano indicated that he had the opportunity to read and discuss the Plea Agreement with his counsel before he signed it. (*Id*. at 4:22-25.) Feliciano also indicated that he understood the terms of the Plea Agreement and that it contained the complete understanding between himself and the Government. (*Id*. at 5:1-6.)

In reviewing the Plea Agreement, the prosecutor, Todd Hinkley, detailed the salient

2

terms of the agreement, including the appeal waiver. (*Id*. at 9:16-11:23.) Feliciano's former counsel, Thomas Sundmaker ("Sundmaker"), addressed the fact that his client was waiving his right to appeal and collaterally attack the judgment of sentence:

> Mr. Sundmaker: Yes, your Honor. For the record, I did have the opportunity to discuss prior to entering into the plea agreement with Mr. Feliciano that this is what's called a post-*Booker* plea agreement. I specifically went through the guidelines and the factors that are applicable to the nature of the offense and the offense gravity score, and also went through the Sentencing Guidelines table with Mr. Feliciano with regard to the difference between a minimum mandatory due to quantities and weights.
>
> Also, part of the negotiations were to a specific weight and amount, between two level guidelines, which put the guideline at a 22 absent basically Mr. Feliciano being found a career offender. It's my understanding that he's a category one. I explained that all to him. We went through all of his post-sentencing rights that he would have were this not a *Booker* plea. Mr. Feliciano indicated an understanding of that, and that this was the *quid pro quo* with the government in exchange for the guilty plea, that the government would be giving up certain rights, including the seeking of mandatories and seeking certain guideline enhancements.

(*Id*. at 12:8-13:2.)

Feliciano was then asked if he was satisfied with giving up his right to appeal based on the bargain that he made with the Government. Feliciano replied in the affirmative. (*Id*. at 13:6-9.) Thus, I was "satisfied that the waiver of appeal is both knowing and voluntary." (*Id*. at 13:10-11.)

After considering the facts that the Government would present at trial, I determined that the plea was knowing and voluntary and supported by an independent basis in fact containing the essential elements of the offense. (*Id*. at 21:9-15.) As a result, Feliciano was adjudged guilty of the offense alleged in the Indictment. (*Id*. at 21:15-17.)

Thereafter, the issue of whether Feliciano should be detained pending sentencing was discussed. Specifically, the following exchange took place:

> The Court: Mr. Zdaniewicz, has there been any supervision up til now?
>
> Probation Officer Zdaniewicz: Your Honor, there's no problem with pretrial release. And I just want to mention that he is a citizen of the Dominican Republic. Now, whether or not immigration has any intention to lodge a detainer --

3

> Mr. Sundmaker: They did lodge a detainer against one of the co-defendants when were were originally in Scranton - - or no, here for the initial appearance. They did not lodge a detainer against Mr. Feliciano. From my understanding, there was no intention at that time of lodging a detainer against him. But I do not know of any further - -
>
> The Court: Mr Hinkley, do you know anything about that?
>
> Mr. Hinkley: I'm sorry, this is Attorney Gurganus's case.
>
> The Court: Oh, so you don't know?
>
> Mr. Hinkley: It does concern the government somewhat. I'm not sure what the status - - what is the status of - - what's his - -
>
> Mr. Sundmaker: They were here. They took the other guy away.
>
> Mr. Hinkley: What is his status? Is he a green card holder or - -
>
> Mr. Sundmaker: Currently, Jhonny, you're a legal immigrant?
>
> Interpreter: No. I have permanent residency.
>
> Mr. Sundmaker: Permanent residency.
>
> The Court: Any children born in the United States?
>
> Interpreter: All of them.
>
> Mr. Sundmaker: That may be why, Judge.

(*Id*. at 26:17-27:22.) After considering Feliciano's circumstances, I found it appropriate to allow him to remain on release pending sentencing.

In connection with sentencing, the probation office prepared and submitted a Presentence Investigation Report. The Presentence Investigation Report states: "Officials of the Bureau of Immigration and Customs Enforcement indicate that Jhonny Feliciano is a legal resident alien. Although he is living legally in the United States, he may be subject to deportation proceedings as a result of the instant conviction." (*Report*, ¶ 39.) Additionally, the Presentence Investigation Report notes: "Jhonny Feliciano primarily speaks Spanish. He is able to speak and understand English effectively." (*Id*. at ¶ 43.)

Ultimately, Feliciano was sentenced to a term of thirty (30) months' imprisonment. (Doc. 47.)

4

**B.     Feliciano's Motion and the Government's Opposition**

On October 13, 2012, Feliciano filed the instant motion pursuant to 28 U.S.C. § 2255. (Doc. 43.) According to Feliciano, he does not read or write the English language to any measurable degree, and he is only able to maintain rudimentary conversations in English. (*Feliciano Aff.*, ¶ 3.) Yet, the written Plea Agreement provided to Feliciano by his counsel was written entirely in English. (Doc. 43, ¶ 7.) The Plea Agreement was reviewed in cursory fashion with Feliciano by his attorney in English, and the Plea Agreement was not read or translated into Spanish for Feliciano. (*Id*. at ¶ 8.) Even though Feliciano did not understand the written Plea Agreement, his counsel advised him to execute it. (*Id*.) At the guilty plea hearing, Feliciano was not advised by either his counsel or the Court that there would be immigration consequences as the result of his guilty plea, as he never read, saw, or comprehended such a result by signing the plea agreement. (*Id*. at ¶ 9.) Essentially, Feliciano contends that he was unaware, not warned, and misadvised about any immigration consequences resulting from his guilty plea. (*Id*. at ¶ 18.) Feliciano is also appealing an order of removal rendered against him in September 2012. (*Id*. at ¶ 19.)

Based on his counsel's alleged failure to advise him of the immigration consequences of his guilty plea, Feliciano asserts that he was denied the effective assistance of counsel. (*Id*. at ¶¶ 24-28.) Feliciano requests that the Court vacate and set aside the judgment of conviction entered against him. (*Id*. at ¶ 31.)

The Government raises two arguments in opposition to Feliciano's § 2255 motion. (Doc. 50.) First, the Government contends that the motion should be denied because Feliciano waived his right to collaterally attack his conviction and sentence. Alternatively, the Government maintains that the motion should be denied because Feliciano cannot demonstrate that his counsel's representation fell below an objective standard of reasonableness. In particular, the Government argues that there is not a reasonable

probability that, but for counsel's alleged errors, the result of the proceedings would have been different. The Government emphasizes that Feliciano cannot demonstrate that he would have gone to trial in an effort to avoid deportation because he was caught with 300 grams of cocaine, he confessed, and he provided a statement under a Proffer Agreement.

**C.     The October 23, 2013 Evidentiary Hearing**

On October 23, 2013, an evidentiary hearing was held on Feliciano's motion. At the hearing, Feliciano testified that prior to entering his guilty plea on May 26, 2011, the Plea Agreement was never read to him in Spanish. Feliciano also stated that before signing the Plea Agreement, he never read, in either English or Spanish, paragraph 27 of the agreement, the deportation provision. Likewise, he testified that Sundmaker did not explain the deportation provision to him or read paragraph 27 to him in English or Spanish. Rather, Sundmaker simply showed him a copy of the Plea Agreement and asked him to sign it. Sundmaker also did not review the Plea Agreement at all with Feliciano, despite the fact that Feliciano indicated during the guilty plea colloquy that he had an opportunity to read and discuss the agreement with Sundmaker and that he understood the terms of the Plea Agreement.

Feliciano initially testified that he signed the Plea Agreement on the day he arrived at the courthouse to plead guilty. Feliciano further indicated that he was presented with the Plea Agreement on that day with no signatures, he signed the agreement, and then he proceeded to plead guilty. However, Feliciano subsequently clarified that he signed the Plea Agreement at Sundmaker's office on November 22, 2010, approximately six months before his guilty plea was entered.

Feliciano further testified that at the time he pled guilty he was not aware that he would face deportation as a result of his plea. And, had he been aware of the deportation consequences of the guilty plea, Feliciano indicated that he would not have pled guilty.

6

Feliciano also testified that he was given the name of an immigration lawyer by Sundmaker only after he learned that he was subject to deportation.

During the Government's cross-examination, Feliciano was questioned about the night of his arrest. Feliciano acknowledged that he gave a confession at the time of his arrest, and he further admitted that he revealed to the arresting trooper that he had 300 grams of cocaine.

Feliciano also testified about a proffer interview that took place on August 2, 2010. The interview was conducted by Task Force Officer Louis Calavini ("Calavini") and Special Agent Mark Gaburar. Sundmaker was also present during the interview. The interview was conducted under the terms of a Proffer Agreement signed by Feliciano. During that interview, Feliciano informed the investigators of his prior drug trafficking activities. At the evidentiary hearing, Calavini testified that the proffer interview was conducted in English. Calavini believed Feliciano understood the questions that were asked during the interview.

Maureen Harrity Jones ("Jones") also testified at the evidentiary hearing. Jones, a pre-trial services officer for the United States Probation Office, was responsible for supervising Feliciano until he surrendered to the Bureau of Prisons on November 14, 2011. During that time, Jones had fourteen office visits and six telephone calls with Feliciano. The conversations were all in English, and Jones did not believe that Feliciano had difficulty understanding English or communicating with her.

The final witness to testify at the evidentiary hearing was Sundmaker. Sundmaker represented Feliciano starting with his initial appearance in federal court. During the course of representing Feliciano, Sundmaker had a number of conversations with him. Although there was an interpreter during the in-court appearances, Sundmaker did not have the services of an interpreter when they met privately. However, Sundmaker had no difficulty communicating with Feliciano in English during these meetings. Sundmaker testified that

7

when he spoke with Feliciano "he indicated that he understood what I was saying to him. He was able to ask me questions regarding his case. He was particularly able to ask me questions with regard to his concern about- concerns about his wife's case and her being charged. That certainly- and he was well aware of that. But as far as his proficiency in English. His proficiency in English was quite good. I've had many clients who have had far worse proficiency in English."

Eventually, Feliciano and the Government entered into plea negotiations. Sundmaker received the proposed Plea Agreement and sent a copy to Feliciano with a request that he schedule an appointment to review the Plea Agreement. Feliciano scheduled an appointment and attended a meeting at Sundmaker's office to discuss the agreement.

Sundmaker reviewed the Plea Agreement line-by-line and paragraph-by-paragraph with Feliciano. With respect to the deportation provision, paragraph 27, Sundmaker explained to Feliciano that deportation was an "absolute" consequence of the guilty plea, and Sundamaker stated that he definitely reviewed this provision with Feliciano. Sundmaker testified that he informed Feliciano on at least two occasions that he would be deported as a result of a guilty plea. Thus, Sundmaker had no question in his mind that Feliciano understood that he faced deportation as a result of the conviction. Sundmaker also testified that he explained the appeal and collateral attack waiver provision in the Plea Agreement to Feliciano.

In addition, Sundmaker informed Feliciano that he was a criminal defense attorney and not an immigration attorney. Sundmaker referred Feliciano to Bob Hessel of the Latin American Speaking Society of Lehigh Valley, as well as an immigration attorney from Jersey City or Essex County, New Jersey. While Sundmaker could not recall the times or dates he made these referrals, the referrals were made prior to Feliciano's guilty plea. However,

Sundmaker did not know if Feliciano ever spoke to the immigration attorney or Bob Hessel.

Based on the foregoing, Feliciano argues that his counsel was ineffective for failing to inform him of the immigration consequences of his guilty plea. Feliciano seeks an order vacating his guilty plea, the judgment of conviction, and the sentence. Feliciano's § 2255 motion is ripe for disposition.

## II. Legal Standard

"Motions pursuant to 28 U.S.C. § 2255 are the presumptive means by which federal prisoners can challenge their convictions or sentences that are allegedly in violation of the Constitution." *Okereke v. United States*, 307 F.3d 117, 120 (3d Cir. 2002). Section 2255 permits a prisoner sentenced by a federal court to move the court that imposed the sentence to "vacate, set aside, or correct the sentence" where: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose such sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255(a).

## III. Discussion

The Government first argues that Feliciano's motion should be denied because he waived his right to collaterally attack his conviction and sentence. The United States Court of Appeals for the Third Circuit has recognized that a defendant may waive the right to direct and collateral attacks, provided the waivers are "entered into knowingly and voluntarily, and their enforcement does not work a miscarriage of justice." *United States v. Mabry*, 536 F.3d 231, 237 (3d Cir. 2008) (citing *United States v. Khattak*, 273 F.3d 557, 561 (3d Cir. 2001)). "[A] court has an affirmative duty both to examine the knowing and voluntary nature of the waiver and to assure itself that its enforcement works no miscarriage of justice, based on the record evidence before it." *Id*. at 237-38 (citing *Khattak*, 273 F.3d

at 563).

"'Knowing and voluntary' indicates that 'the defendant actually does understand the significance and consequence' of the waiver and that 'the decision is uncoerced.'" *United States v. Sabater*, 441 F. App'x 68, 70 (3d Cir. 2011) (quoting *Fahy v. Horn*, 516 F.3d 169, 185 (3d Cir. 2008)). Where there is no allegation that the defendant was misled into waiving his or her collateral attack rights, the court may determine whether the waiver was knowing and voluntary by examining the written plea agreement and the change-of-plea-colloquy. *See Mabry*, 536 F.3d at 238.

Here, as there is no allegation that Feliciano was coerced or misled into waiving his collateral attack rights, the validity of the waiver can be resolved by considering the Plea Agreement and the change-of-plea colloquy. With respect to the written Plea Agreement itself, Feliciano's collateral attack waiver is set forth explicitly in that agreement. The written Plea Agreement provides that the waiver is very broad, applies to both direct appeal and collateral challenges, and it was signed by Feliciano. (*Plea Agreement*, ¶ 31.)

A review of the plea colloquy confirms that Feliciano understood the waiver. At the plea colloquy, I "inform[ed] the defendant of, and determine[d] that the defendant underst[ood] . . . the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence as Federal Rule of Criminal Procedure 11(b)(1)(N) requires." *Mabry*, 536 F.3d at 239. Specifically, at the plea hearing, Feliciano, while under oath, acknowledged that he read and discussed the plea agreement with his counsel before signing it. (Doc. 49, 4:22-5:6.) And, during the plea colloquy, the Government summarized the plea agreement and reviewed the collateral attack waiver provision, which included a waiver of his right to challenge his conviction or sentence under § 2255. (*Id*. at 11:11-15.) Thereafter, Feliciano affirmed that he understood and was satisfied that he was giving up his appeal and collateral review rights based on his bargain with the Government. (*Id*. at

10

13:3-9.)

The record in this case thus conclusively establishes that Feliciano was informed that by pleading guilty he was waiving his right to appeal or collaterally attack his conviction and sentence. Furthermore, the record also confirms that Feliciano understood he was waiving these rights. As such, the waiver was knowing and voluntary.

Having concluded that Feliciano's waiver was knowing and voluntary, the second consideration is whether enforcement of the knowing and voluntary waiver would work a miscarriage of justice. *See Mabry*, 536 F.3d at 239. A "common sense approach" applies to determining whether a miscarriage of justice would occur if the waiver is enforced. *See id*. at 242. "In considering whether enforcing a waiver would result in a miscarriage of justice," relevant considerations include "'the clarity of the error, its gravity, its character (*e.g.*, whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result.'" *United States v. Delbridge*, 504 F. App'x 145, 150 (3d Cir. 2012) (quoting *Mabry*, 536 F.3d at 242-43). The miscarriage of justice standard is to be applied "'sparingly and without undue generosity.'" *Id*. (quoting *United States v. Wilson*, 429 F.3d 455, 458 (3d Cir. 2005)). A miscarriage of justice is not created merely because the appellate waiver bars a meritorious claim. *See Khattak*, 273 F.3d at 561-62.

The Third Circuit has acknowledged that a miscarriage of justice may exist in a case "raising allegations that counsel was ineffective or coercive in negotiating the very plea agreement that contained the waiver." *Mabry*, 536 F.3d at 243. However, the Third Circuit has "not addressed whether ineffective assistance of counsel will always invalidate a waiver." *United States v. Padilla-Castro*, 426 F. App'x 60, 62-63 (3d Cir. 2011) (citing *United States v. Shedrick*, 493 F.3d 292, 298 n.6 (3d Cir. 2007)).

11

In this case, Feliciano suggests that a miscarriage of justice would result if his collateral attack waiver is enforced. In particular, he argues that he was deprived the effective assistance of counsel since he was not properly advised of the immigration consequences of his guilty plea. The miscarriage of justice exception does not apply here because the record establishes that Feliciano's ineffective assistance of counsel claim is without merit.

To establish he was denied the effective assistance of counsel, Feliciano must show that (1) the performance of trial counsel fell below an objective standard of reasonableness, and (2) the performance of counsel unfairly prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88, 691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "Both *Strickland* prongs must be satisfied." *George v. Sively*, 254 F.3d 438, 443 (3d Cir. 2001) (citing *United States v. Nino*, 878 F.2d 101, 104 (3d Cir. 1989)).

The first *Strickland* prong requires a defendant to "establish . . . that counsel's performance was deficient." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001.) Proving a deficiency in conduct "'requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed defendant by the Sixth Amendment.'" *Id*. (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052). "In assessing counsel's performance, 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Id*. (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052).

"Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is to say, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

12

*Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. It is well-settled that the benchmark for judging any claim of ineffectiveness of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*.

The second prong of *Strickland* requires a defendant to show that counsel's performance unfairly prejudiced the defendant, meaning that counsel's errors were so serious as to deprive the defendant of a trial whose result is reliable. *Id*. at 687, 104 S. Ct. 2052. It is not enough to show that the error had some conceivable effect on the outcome of the proceeding, for virtually every act or omission would meet such a test. *Id*. at 693, 104 S. Ct. 2052. Rather, the defendant must show there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id*. at 694, 104 S. Ct. 2052. A reasonable probability is sufficient to undermine confidence in the outcome of the trial. *Id*. Effectiveness of counsel applies to advice given by counsel during guilty plea discussions. *See Hill v. Lockhart*, 474 U.S. 52, 58, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985); *United States v. Booth*, 432 F.3d 542, 547 (3d Cir. 2005).

Basing his claim on the Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010),[1] Feliciano asserts that he was denied the effective assistance of counsel when he was allegedly not informed about the potential deportation consequences of his guilty plea. In *Padilla*, the Court concluded that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel." 130 S. Ct. at 1482, 130 S. Ct. 1473. In reaching that conclusion, the Court

---

[1] *Padilla* announced a "new rule," and "defendants whose convictions became final prior to *Padilla* therefore cannot benefit from its holding." *Chaidez v. United States*, - - - U.S. - - -, 133 S. Ct. 1103, 1113, 185 L. Ed. 2d 149 (2013). Feliciano's conviction, however, became final over a year after *Padilla* was decided.

13

emphasized that prevailing professional norms supported the view that counsel must advise his or her client regarding the risk of deportation. *Id*. The Court also found significant that "'preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.'" *Id*. at 1483, 130 S. Ct. 1473 (quoting *INS v. St. Cyr*, 533 U.S. 289, 323, 121 S. Ct. 2271, 150 L. Ed. 2d 347 (2001)).

According to the *Padilla* Court, the first prong of the *Strickland* analysis is clearly satisfied when "counsel [fails] to provide her client with available advice about an issue like deportation." *Id*. at 1484, 130 S. Ct. 1473. However, the Court acknowledged that:

> Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it. There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. The duty of the private practitioner in such cases is more limited. When the law is not succinct and straightforward (as it is in many of the scenarios posited by Justice ALITO), a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.

*Id*. at 1483, 130 S. Ct. 1473. Thus, the Supreme Court held that counsel "must inform her client whether his plea carries a risk of deportation" to satisfy her obligations under the Sixth Amendment. *Id*. at 1486.

*Padilla*, though, "did not address the second prong of the *Strickland* test in the context of criminal defendants facing deportation." *United States v. Dwumaah*., No. 05-CR-0157, 2013 WL 420425, at *6 (M.D. Pa. Feb. 1, 2013). However, Supreme Court precedent demonstrates that the prejudice inquiry in a challenge to a guilty plea based on counsel's ineffective assistance requires the defendant show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985); *Dwumaah*, 2013 WL 420425, at *6. That is, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process."

14

*Hill*, 474 U.S. at 59, 106 S. Ct. 366.

Feliciano is unable to satisfy either *Strickland* prong. First, Feliciano fails to demonstrate that his attorney's performance was deficient. In particular, the testimony at the evidentiary hearing confirms that Sundmaker reviewed the Plea Agreement with Feliciano line-by-line and paragraph-by-paragraph, including the deportation provision. Sundmaker also testified that he absolutely advised Feliciano that he would be deported if he pled guilty. And, before the guilty plea was entered in this case, Sundmaker advised Feliciano to speak with an immigration attorney, and Sundmaker provided Feliciano with an immigration attorney's contact information. Although Feliciano testified that Sundmaker never advised him of the deportation consequences of entering a guilty plea, considering Feliciano's statements that he reviewed and understood the terms of the Plea Agreement during the guilty plea colloquy, the testimony at the evidentiary hearing, and the demeanor of the witnesses, the Court finds Sundmaker's testimony more credible.

Nor does the Court find Sundmaker's performance deficient because he did not review the Plea Agreement with Feliciano in Spanish. Again, at the time he entered a plea of guilty, Feliciano, through an interpreter, indicated that he reviewed and understood the Plea Agreement. In addition, the testimony of Calavini, Jones, and Sundmaker confirms that Feliciano was able to communicate in English regarding his criminal activity, the conditions of his pretrial release, and the nature of the charges against him. And, as elicited by his counsel at the evidentiary hearing, Feliciano passed the English interview required as part of the United States naturalization test. While Feliciano was provided with the services of an interpreter during his in-court appearances, the record in this case reflects that Feliciano could converse effectively in English. Thus, the fact that Sundmaker did not have the Plea Agreement translated to Spanish prior to Feliciano entering a guilty plea was not deficient performance under *Strickland*.

Second, and in any event, even if Sundmaker's performance was deficient, Feliciano cannot establish that in light of counsel's errors he would have pled not guilty and proceeded to trial. In this case, the evidence of Feliciano's guilt was overwhelming. Feliciano was arrested while possessing 300 grams of cocaine. At the time of his arrest, Feliciano confessed to the arresting trooper. Thereafter, pursuant to the terms of a Proffer Agreement, Feliciano provided a proffer statement detailing his criminal activity. Simply put, there is not a reasonable probability based on this record that Feliciano would have pled not guilty and insisted on proceeding to trial. Thus, to the extent that Sundmaker's performance can be characterized as deficient, it did not prejudice Feliciano. Feliciano, therefore, fails to make the necessary showing to establish an ineffective assistance of counsel claim under *Strickland*.

## IV. Conclusion

For the above stated reasons, Feliciano's motion will be denied. Furthermore, in proceedings brought pursuant to 28 U.S.C. § 2255, an applicant cannot appeal to the circuit court unless a certificate of appealability ("COA") has been issued. Under 28 U.S.C. § 2253(c)(2), a court may not issue a COA unless "the applicant has made a substantial showing of the denial of a constitutional right." Restated, a COA should not be issued unless "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000). As reasonable jurists would not disagree with the resolution of Feliciano's motion, a COA will not issue.

An appropriate order follows.

November 6, 2013  /s/ A. Richard Caputo
Date  A. Richard Caputo
 United States District Judge